# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Rodney Lavelle Taylor,

                Petitioner

v.

Jo Gentry, et al.,

                Respondents

Case No. 2:17-cv-01590-JAD-VCF

**Order Denying Petition for Habeas Relief and Closing Case**

Petitioner Rodney Lavelle Taylor was found guilty of second-degree kidnapping in Nevada State Court and sentenced to life with the possibility of parole after a minimum of ten years.[1]  In a five-count petition, Taylor seeks a writ of habeas corpus under 28 U.S.C. § 2254 based on claims that his trial counsel was ineffective.[2]  Having evaluated Taylor's claims on their merits, I find that habeas relief is not warranted.  So I deny the petition and a certificate of appealability, and I close this case.

## Background

**A.    The facts underlying Taylor's conviction**[3]

On August 18, 2012, Ashley M. was attempting to find drugs to sell in order to support her methamphetamine addiction when she was introduced to Kineisha Smith-White.  Smith-White and Ashley smoked and injected methamphetamine in Smith-White's motel room, and Smith-White's boyfriend, Taylor, eventually joined them.  Ashley later left the motel room to

---

[1] ECF No. 14-6.

[2] ECF No. 5.

[3] These facts are taken from the trial transcript.  ECF No. 13-28.  For simplicity's sake, I cite to this exhibit generally for this entire background section.

attempt to sell some drugs for Smith-White and Taylor, but when she was unsuccessful in doing so, she returned to the motel room to pay Smith-White and Taylor for the methamphetamine she had used.  Taylor responded that Ashley owed them $500.00, that she was going to prostitute, and that she was not allowed to leave.  Smith-White then physically attacked Ashley after learning that Ashley had planned on stealing from them.

Ashley was prohibited from leaving the motel room on August 19, 2012, and on August 20, 2012, Smith-White and Taylor attempted to purchase bus tickets for the three of them to go to San Francisco so that Ashley could prostitute off her debt.  Due to insufficient funds, the bus tickets were never purchased, and Smith-White and Taylor took Ashley to several other motels and Smith-White's residence before ending up at the Ponderosa Hotel.  While Taylor was getting a room at the Ponderosa Hotel, Ashley ran into an office and asked an employee to call law enforcement.

**B.   Procedural history**

On March 20, 2013, a jury found Taylor guilty of second-degree kidnapping.[4]  The state trial court adjudged Taylor to be a habitual criminal and sentenced him to life with the possibility of parole after a minimum of 10 years.[5]  Taylor appealed, and the Nevada Supreme Court affirmed.[6]  Remittitur issued on August 19, 2014.[7]

---

[4] ECF No. 14-2.

[5] ECF No. 14-6.

[6] ECF No. 15-11.

[7] ECF No. 15-12.

Taylor filed a state habeas petition on January 9, 2015.[8]  The state district court denied the petition on August 6, 2015, without a hearing.[9]  Taylor moved for reconsideration, which the state district court also denied.[10]  Taylor appealed, and the Nevada Court of Appeals affirmed.[11] Remittitur issued on April 17, 2017.[12]

Taylor filed a federal habeas petition and an amended federal habeas petition on November 1, 2017, and November 27, 2017, respectively.[13]  The respondents answered Taylor's amended federal petition on August 20, 2018.[14]  Taylor did not reply.  Taylor alleges that his trial counsel was ineffective for five reasons:

1.   Failing to move to sever his trial from Smith-White's trial;

2.   Not objecting to an officer's alleged expert testimony on street culture;

3.   Failing to investigate the video surveillance cameras at the Greyhound bus station and the Ponderosa Hotel;

4.   Failing to investigate Ashley's mental health and impeach her with it; and

5.   Failing to request a special cautionary instruction concerning testimony by a methamphetamine addict.[15]

I consider the merits of each ground.

---

[8] ECF No. 15-15.

[9] ECF No. 15-25.

[10] ECF No. 15-32.

[11] ECF No. 15-43.

[12] ECF No. 15-44.

[13] ECF Nos. 4, 5.

[14] ECF No. 12.

[15] ECF No. 5.

**Discussion**

**A.**   **Legal standards**

      *1.*   ***Review under the Antiterrorism and Effective Death Penalty Act (AEDPA)***

      If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[16]  A state court acts contrary to clearly established federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts.[17]  And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the facts at hand.[18]  Section 2254 does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or "license federal courts to treat the failure to do so as error."[19]  The "objectively unreasonable" standard is difficult to satisfy;[20] "even 'clear error' will not suffice."[21]

---

[16] 28 U.S.C. § 2254(d).

[17] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[18] *White v. Woodall*, 572 U.S. 415, 419 (2014).

[19] *Id.* at 1705–06.

[20] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[21] *Wood v. McDonald*, 575 U.S. 312, 316 (2015) (per curiam) (citation omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

Habeas relief may only be granted if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[22] As "a condition for obtaining habeas relief," a petitioner must show that the state-court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."[23]  "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief under Section 2254(d) is precluded.[24]  AEDPA "thus imposes a 'highly deferential standard for evaluating state-court ruling,' . . . and 'demands that state-court decisions be given the benefit of the doubt.'"[25]

If a federal district court finds that the state court committed an error under § 2254, the district court must then review the claim de novo.[26]  The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief,[27] but state-court factual findings are presumed correct unless rebutted by clear and convincing evidence.[28]

---

[22] *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

[23] *Id.* at 103.

[24] *Id.* at 101.

[25] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

[26] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

[27] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[28] 28 U.S.C. § 2254(e)(1).

### 2. *Standard for federal habeas review of an ineffective-assistance claim*

The right to counsel embodied in the Sixth Amendment provides "the right to the effective assistance of counsel."[29]  Counsel can "deprive a defendant of the right to effective assistance[] simply by failing to render 'adequate legal assistance[.]'"[30]  In the hallmark case of *Strickland v. Washington*, the United States Supreme Court held that an ineffective-assistance claim requires a petitioner to show that: (1) his counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all of the circumstances of the particular case;[31] and (2) it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.[32]

A reasonable probability is "probability sufficient to undermine confidence in the outcome."[33]  Any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct so as to avoid the distorting effects of hindsight.[34]  "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practice or most common custom."[35]  The burden is on the petitioner to overcome the presumption that counsel made sound trial-strategy decisions.[36]

---

[29] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

[30] *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 335–36 (1980)).

[31] *Id.* at 690.

[32] *Id.* at 694.

[33] *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).

[34] *Strickland*, 466 U.S. at 689.

[35] *Harrington*, 562 U.S. at 104.

[36] *Id.*

1    The United States Supreme Court has described federal review of a state supreme court's

2  decision on an ineffective-assistance claim as "doubly deferential."[37]  Courts must "take a

3  'highly deferential' look at counsel's performance . . . through the 'deferential lens of

4  § 2254(d)'"[38] and consider only the record that was before the state court that adjudicated the

5  claim on its merits.[39]

6  **B.    Evaluating Taylor's claims**

7    Taylor asserts that his trial counsel was ineffective.  I now address his grounds for this

8  claim in the order in which they were made.

9    ***1.    Ground 1—failure to move for severance***

10    In Ground 1, Taylor asserts that his federal constitutional rights were violated when his

11  trial counsel failed to move to sever his trial from Smith-White's trial.[40]  Taylor elaborates that

12  Ashley's testimony was mainly directed at Smith-White, as Ashley testified that Smith-White

13  verbally and physically abused her while Taylor merely sat by.[41]  In Taylor's appeal of the denial

14  of his state habeas appeal, the Nevada Court of Appeals rejected this theory:

15         Lavelle-Taylor argued his trial counsel was ineffective for failing
          to file a motion to sever his case from his codefendant's case.
16         Lavelle-Taylor asserted counsel should have sought severance of
          the cases because the evidence was overwhelmingly directed at
17         Lavelle-Taylor's codefendant and their defenses were antagonistic.
          Lavelle-Taylor failed to demonstrate his counsel's performance
18         was deficient or resulting prejudice.  "[A] defendant is not entitled
          to a severance merely because the evidence admissible against a
19         co-defendant is more damaging than that admissible against the
          moving party." *Lisle v. State*, 113 Nev. 679, 690, 941 P.2d 459,

20

---

21  [37] *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

    [38] *Id.*

22  [39] *Id.* at 181–84.

23  [40] ECF No. 5 at 3.

    [41] *Id.*

466 (1997), *overruled on other grounds by Middleton v. State*, 114 Nev. 1089, 1117 n.9, 968 P.2d 296, 315 n.9 (1998), and therefore, Lavelle-Taylor would not have been entitled to severance on the basis that there was more evidence implicating his codefendant in the kidnapping.  Further, the defenses were not antagonistic; a review of the record reveals both defendants argued the victim was not believable given her methamphetamine use and both asserted the kidnapping did not occur.  Therefore, counsel's failure to move for severance of the cases on these bases did not demonstrate counsel acted in an objectively unreasonable manner.

Moreover, the evidence produced at trial established Lavelle-Taylor was an active participant in the kidnapping, as he told the victim she could not leave until she earned money by committing acts of prostitution, used his physical presence to intimidate the victim and block her exits, and took the victim to a bus station and hotels against her will.  In addition, after the victim escaped into a hotel office to request help and the hotel employee called emergency services, Lavelle-Taylor and his codefendant fled the scene together.  Under these circumstances, Lavelle-Taylor failed to demonstrate a reasonable probability of a different outcome had counsel sought to sever the codefendants' cases.  *See Marshall v. State*, 118 Nev. 642, 647, 56 P.3d 376, 379 (2002) ("To establish that joinder was prejudicial requires more than simply showing that severance made acquittal more likely; misjoinder requires reversal only if it has a substantial and injurious effect on the verdict.").  Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.[42]

The Nevada Court of Appeals' rejection of Taylor's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.  Ashley M. testified that on August 18, 2012, she was twenty-seven years old, homeless, living in Reno, Nevada, addicted to methamphetamine, and "run[ning] people's drugs for them" to make some money.[43]  In the late afternoon of August 18,

---

[42] ECF No. 15-43 at 3–4.

[43] ECF No. 13-28 at 5–6.

2012, Ashley was at the Keno Motel trying to find some drugs to sell.[44]  Ashley visited her friend Deanna, and during that visit, she met Kineisha Smith-White, another patron of the Keno Motel.[45]  Ashley eventually went with Smith-White to her motel room where she met Taylor, Smith-White's boyfriend, and they smoked and injected methamphetamine.[46]  Ashley testified that Smith-White was a prostitute, and Ashley, too, showed interest in becoming a prostitute.[47]  Ashley explained that she never actually wanted to be a prostitute, but she thought that "if [she] went along with it, that would get them on [her] side, and then [she] could possibly persuade the situation into [her] selling their drugs."[48]  Taylor took pictures of Ashley to put on an escort-service website.[49]

Throughout the evening and night of August 18 and the morning of August 19, 2012, Ashley tried to find customers to buy Taylor's and Smith-White's drugs.[50]  Ashley was unsuccessful, so she "came to the conclusion that th[e] whole mission was a failure, and that [she] needed to go back and tell them that [she] couldn't prostitute . . . and ask them how much [she] owed them."[51]  After Ashley communicated this information to Taylor and Smith-White, Taylor told Ashley that she "owed him $500.00, and that [she] was going to prostitute, and [she]

---

[44] *Id.* at 9–12.

[45] *Id.* at 12–13.

[46] *Id.* at 14, 16.

[47] *Id.* at 15.

[48] *Id.*

[49] *Id.* at 16.

[50] *Id.* at 17–18.

[51] *Id.* at 19.

wasn't leaving until it was done."[52]  Ashley did not feel safe to leave the hotel room at that point, fearing that she would be harmed if she did.[53]

Ashley's estranged husband, who knew Taylor and Smith-White, showed up at the motel room and told Taylor and Smith-White that Ashley was planning on stealing from them.[54] Smith-White, upon hearing of Ashley's plan, physically and verbally attacked Ashley.[55]  Ashley ran to the bathroom and yelled for help, but Smith-White broke into the bathroom and told Ashley that "if [she] ever pulled that again, she would take care of [her]."[56]  Smith-White then told Ashley's estranged husband that "they were going to take [her] to California and put [her] on the track and make [her] prostitute until they were done with [her]. And then [Smith-White] was going to kill [her]."[57]  Smith-White and Taylor then rearranged the furniture in the motel room to make sure that Ashley could not get out during the night.[58]

The next day, August 20, 2012, Smith-White and Taylor took Ashley to Smith-White's house and then to the Greyhound bus station.[59]  Smith-White took Ashley into the Greyhound bus station bathroom while Taylor attempted to buy bus tickets to San Francisco.[60]  However, Taylor did not have enough funds for the tickets, so Taylor and Smith-White took Ashley to the Castaway Motel where they collected money from a woman named Jessica and then to another

---

[52] *Id.* at 20.

[53] *Id.* at 22.

[54] *Id.* at 23–24.

[55] *Id.* at 24, 27.

[56] *Id.* at 27.

[57] *Id.* at 28.

[58] *Id.* at 34.

[59] *Id.* at 36, 38.

[60] *Id.* at 39–40.

hotel to have Ashley prostitute.[61]  However, before any prostitution could take place, the manager of the property told them to leave.[62]  Taylor and Smith-White then took Ashley back to Smith-White's house and eventually to the Ponderosa Hotel.[63]  While Taylor was at the front counter of the Ponderosa Hotel renting a motel room, Ashley mouthed "help me" to the employee working at the front counter.[64]  The manager of the Ponderosa Hotel then opened up his office door, and Ashley ran into it telling him that Smith-White and Taylor were keeping her against her will.[65]  When the manager said that he was calling law enforcement, Taylor and Smith-White left.[66]

It is true, as Taylor contends, that a good portion of Ashley's testimony was directed at how Smith-White treated her.  However, under Nevada law, "a defendant is not entitled to severance merely because the evidence admissible against a co-defendant is more damaging than that admissible against the moving party."[67]  Further, Ashley's testimony demonstrated that Taylor supported Smith-White in her actions against Ashley and that Taylor was the one that stated that Ashley "owed him $500.00, and that [she] was going to prostitute, and [she] wasn't leaving until it was done."[68]  Because Ashley's testimony implicated both Taylor and Smith-White in the kidnapping, the Nevada Court of Appeals reasonably concluded that Taylor failed

---

[61] *Id.* at 40–42.

[62] *Id.* at 42.

[63] *Id.* at 47.

[64] *Id.* at 48.

[65] *Id.* at 49.

[66] *Id.* at 50.

[67] *See Lisle v. State*, 941 P.2d 459, 466 (Nev. 1997), *overruled on other grounds by Middleton v. State*, 968 P.2d 296, 315 n.9 (Nev. 1998).

[68] ECF No. 13-28 at 20.

1   to demonstrate that his trial counsel was deficient in not moving for a severance based on

2   Ashley's testimony.[69]  Therefore, Taylor is denied federal habeas relief for Ground 1.

3          **2.    *Ground 2—failure to object to officer's non-expert testimony***

4          In Ground 2, Taylor asserts that his federal constitutional rights were violated when his

5   trial counsel failed to object to Officer Tygard's non-expert testimony about street culture and

6   logic.[70]  In Taylor's appeal of the denial of his state habeas appeal, the Nevada Court of Appeals

7   rejected this theory:

8          Lavelle-Taylor argued his trial counsel was ineffective for failing
           to object when a police officer testified regarding street culture.  At
9          the trial, a police officer testified regarding his interactions with
           the victim following the kidnapping.  During his testimony, the
10         officer briefly stated that he believed the victim's actions could be
           explained by her understanding of "street culture" and persons
11         involved with such a culture have a different way of doing things
           than most people.  The officer then testified the victim's
12         involvement with street culture caused her to fear retaliation from
           the codefendants if she attempted to flee.  The officer did not
13         testify regarding his training or experience with street culture.
           Lavelle-Taylor asserted the officer's testimony regarding street
14         culture amounted to improper expert opinion.  Lavelle-Taylor
           failed to demonstrate prejudice resulting from admission of this
15         testimony.

16         The record reveals the challenged testimony was duplicative of the
           victim's testimony as she testified regarding her experience of
17         living as a homeless methamphetamine addict and the way she had
           to live in order to protect her reputation with others involved in
18         that way of life.  She further testified to her fear the codefendants
           would find her and harm her if she attempted to escape at the
19         wrong time.  Given the victim's testimony, the additional evidence
           produced at trial, and the brief nature of the challenged testimony,
20         Lavelle-Taylor failed to demonstrate a reasonable probability of a
           different outcome at trial had counsel objected when the officer
21         testified regarding street culture.  Therefore, the district court did

22

23  ----

[69] *Strickland*, 466 U.S. at 690.

[70] ECF No. 5 at 5.

not err in denying this claim without conducting an evidentiary hearing.[71]

The Nevada Court of Appeals' rejection of Taylor's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.  Senior Officer Robert Tygard testified that he was dispatched to the Ponderosa Hotel to assist with the kidnapping investigation.[72]  He explained the following in response to the State's questions about what parts of Ashley's story made sense:

> But you gotta understand, this is a secret culture.  It's different than what you and I are used to.  These are people that, they run the streets and they have a way of - - they have their own communication lines.  They have their own different codes that - - the way they do things.  And her - - one of her things that she said was she was afraid that if she left, they would find her and hurt her.[73]

The State then asked Officer Tygard if "that [is] valid street logic," and Officer Tygard confirmed that it "wouldn't make sense to someone from the suburbs who may not have come from that culture."[74]

Prior to Officer Tygard's testimony, Ashley testified that "it [is] important . . . to be honest to run people's drugs" because

> [o]n the streets, all you have is your word.  And if you go against your word in any way, you lose all credibility.  So, therefore, people aren't going to trust you to run their drugs and make money for them, because they are going to think that you're there just to use them and get high and go on.  And when you have your word and you're living off it, that's all you can do.  You have to be completely honest and trustworthy for someone to basically hand over $200, $300 worth of product so you can make that money.

---

[71] ECF No. 15-43 at 5.

[72] ECF No. 13-34 at 8, 10.

[73] *Id.* at 37.

[74] *Id.* at 37–38.

> And then you get a percentage later, but in the meantime - - I mean, if you go against your word, people out there tend to get into far-more-rotten situations.  And that's where a lot of the crime that you hear, that happens on the streets, is because somebody decided to go against them.[75]

Ashley also testified about an area of Reno where she had sold drugs and explained:

> [E]verybody there minds their own business, because in the game - - you know, you can't tell anybody, like especially with law-enforcement or anybody.  You mind your own business.  Because if you have nothing to do with it, then, you know, why bother getting involved?  Because if you do talk to law-enforcement about a situation that you see, you become deemed a snitch.  And when you're deemed a snitch, you can no longer make any money on the streets.  You can't hustle; nobody will trust you.  And a lot of people out there, hustling is their bread and butter, you know.  And to be able to feed themselves or their kids, or take care of themselves, you definitely can't get into anybody else's business.[76]

Finally, during cross-examination by Smith-White's trial counsel regarding why individuals failed to help Ashley, Ashley testified:

> Those people in that area, in the game that we play, or the hustle, you mind your own business.  You don't tell anybody that - - if you were to - - especially if you were to call the cops, that's it, you're done for.  That just creates more problems for yourself: you would be deemed a snitch.  And when you're deemed a snitch, you don't have credibility, and you can't make money.[77]

Although Taylor's trial counsel may have been deficient for failing to object to Officer Tygard's testimony in light of the fact that he did not testify about his training or experience with "street culture," the Nevada Court of Appeals reasonably determined that Taylor failed to demonstrate prejudice.  Indeed, Tygard's testimony about the fear of retaliation on the streets

---

[75] ECF No. 13-28 at 6–7.

[76] *Id.* at 43–44.

[77] ECF No. 13-33 at 39.

14

1  was consistent with Ashley's testimony about credibility and honesty in selling drugs and

2  dealing with drug dealers in order to avoid "far-more-rotten situations."[78]  Because evidence

3  about "street culture" had already been admitted, Taylor has not demonstrated that, but for his

4  trial counsel's failure to object to Officer Tygard's further, similar testimony on "street culture,"

5  the result of his trial would have been different.[79]  Taylor is denied federal habeas relief for

6  Ground 2.

7         **3.**      ***Ground 3—failure to investigate video surveillance***

8         In Ground 3, Taylor asserts that his federal constitutional rights were violated when his

9  trial counsel failed to investigate the video surveillance recordings at the Greyhound bus station

10  and the Ponderosa Hotel.[80]  In Taylor's appeal of the denial of his state habeas appeal, the

11  Nevada Court of Appeals rejected this claim on several bases:

> Lavelle-Taylor argued his trial counsel was ineffective for failing to investigate and prepare for trial.  Lavelle-Taylor asserted counsel should have attempted to obtain surveillance video recordings from the bus station and the Ponderosa Hotel . . . .  Lavelle-Taylor failed to demonstrate his counsel's performance was deficient or resulting prejudice.  Lavelle-Taylor did not demonstrate any of this evidence was actually available and could have been obtained by counsel through reasonably diligent investigation.  Further, the record reveals multiple witnesses, including employees of the Ponderosa Hotel, testified regarding the codefendants' actions with respect to kidnapping the victim and Lavelle-Taylor failed to demonstrate a reasonable probability of a different outcome at trial had counsel attempted to obtain the sought after evidence.  Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.[81]

---

[78] ECF No. 13-28 at 6–7.

[79] *Strickland*, 466 U.S. at 694.

[80] ECF No. 5 at 7.

[81] ECF No. 15-43 at 4–5.

The Nevada Court of Appeals rejection of Taylor's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.  Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."[82]  And "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[83]  This investigatory duty includes investigating the defendant's "most important defense,"[84] and investigating and introducing evidence that demonstrates factual innocence or evidence that raises sufficient doubt about the defendant's innocence.[85]  "[I]neffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case."[86]

It is unclear from the record what, if any, investigation was conducted by Taylor's trial counsel into these video surveillance recordings.  It is also unclear from the record whether these video surveillance recordings existed or whether they were retrievable by Taylor's trial counsel.[87]  But even if Taylor's trial counsel was deficient for failing "to make reasonable

---

[82] *Strickland*, 466 U.S. at 691.

[83] *Id.*

[84] *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994).

[85] *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999).

[86] *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986).

[87] *See* ECF No. 13-34 at 13 (testimony of Officer Tygard that a request was made for the Ponderosa Hotel's surveillance footage on August 20, 2012, but it was unable to be collected at that time).

1   investigations," which is not clear in this case, the Nevada Court of Appeals reasonably

2   concluded that Taylor failed to demonstrate prejudice.[88]

3          Two employees of the Ponderosa Hotel testified and confirmed Ashley's version of

4   events. Calvin Chittem, an employee at the Ponderosa Hotel, testified that, as he was starting to

5   leave his office near the lobby of the Ponderosa Hotel on August 20, 2012, "a white female ran

6   past [him] and was hollering, 'They're gonna kill me. They're gonna kill me."[89] A black female

7   then came behind the white female and said, "'She's in my custody. She does this all the time.

8   We'll take care of this.'"[90] After Chittem indicated that he was going to call law enforcement

9   "to let them straighten it out," the black female and her male friend grabbed their stuff and left.[91]

10  Then Lloyd Daniels, the hotel manager of the Ponderosa Hotel, testified that on August 20, 2012,

11  "an African-American couple came in [to the Ponderosa Hotel] with a white female."[92] Daniels

12  explained that the male came to check in to the hotel while the two females stayed in the back

13  standing very close to each other.[93] As Daniels was discussing room rates with the male, he

14  noticed that the white female was mouthing "[h]elp me."[94] Daniels explained that his

15  maintenance guy then opened a door, "and that's when she come [sic] running in the door

16  saying, 'Help me. Help me.'"[95]

17

18

---

18

19  [88] *Strickland*, 466 U.S. at 691, 694.

    [89] ECF No. 13-34 at 60–62.

20  [90] *Id.* at 62.

21  [91] *Id.* at 66.

    [92] *Id.* at 75–76.

22  [93] *Id.* at 76–77.

23  [94] *Id.* at 78–79.

    [95] *Id.* at 79.

1    Chittem's and Daniels's testimony prevents Taylor from demonstrating that, but for his

2    trial counsel's failure to secure the video surveillance recording from the same events at the

3    Ponderosa Hotel, the result of his trial would have been different.[96]  And it is mere speculation

4    that the Greyhound bus station's potential video surveillance recordings would have contained

5    favorable evidence that would have affected the result of Taylor's trial,[97] especially considering

6    that Ashley testified that Smith-White took her into the bathroom while Taylor attempted to buy

7    bus tickets.[98]  Because the Nevada Court of Appeals reasonably rejected Taylor's ineffective-

8    assistance-of-counsel claim, Taylor is denied federal habeas relief for Ground 3.

9    ### 4.       *Ground 4—failure to investigate the victim's mental health*

10   In Ground 4, Taylor asserts that his federal constitutional rights were violated when his

11   trial counsel failed to investigate the victim's mental health.[99]  Taylor explains that the victim

12   was a patient at Nevada Adult Mental Services and that his trial counsel could have impeached

13   the victim with this information.[100]  In Taylor's appeal of the denial of his state habeas appeal,

14   the Nevada Court of Appeals rejected this theory:

15           Lavelle-Taylor argued his trial counsel was ineffective for failing
             to investigate and prepare for trial.  Lavelle-Taylor asserted
16           counsel should have attempted to obtain . . . the victim's mental
             health records.  Lavelle-Taylor failed to demonstrate his counsel's
17           performance was deficient or resulting prejudice.  Lavelle-Taylor
             did not demonstrate . . . this evidence was actually available and
18           could have been obtained by counsel through reasonably diligent
             investigation.  Further, the record reveals multiple witnesses,
19           including employees of the Ponderosa Hotel, testified regarding

20   ---

[96] *Strickland*, 466 U.S. at 694.

21   [97] *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established
     by mere speculation.").

22   [98] ECF No. 13-28 at 39–40.

[99] ECF No. 5 at 9.

23   [100] *Id.*

18

the codefendants' actions with respect to kidnapping the victim and Lavelle-Taylor failed to demonstrate a reasonable probability of a different outcome at trial had counsel attempted to obtain the sought after evidence.  Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.[101]

The Nevada Court of Appeals reasonably concluded that Taylor failed to demonstrate that his trial counsel was deficient.[102]  First, as the Nevada Court of Appeals reasonably noted, it is unclear whether Ashley had mental-health issues, and even if she did, it is unclear whether Taylor's trial counsel could have obtained her mental–health records.  Second, rather than arguing that Ashley suffered from mental–health issues, Taylor's trial counsel instead presented a defense that Ashley's methamphetamine use distorted her perception of the events that took place between August 18, 2012, and August 20, 2012.  This strategy was reasonable, as "[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'"[103]

Indeed, in order to support this defense, Taylor's trial counsel questioned Ashley about her methamphetamine use and whether it caused her to be paranoid.[104]  Taylor's trial counsel then called Dr. Bittker, a psychiatrist, who testified that "[s]omebody who's using methamphetamine, particularly methamphetamine heavily, will have some significant disruptions in key brain processes."[105]  Dr. Bittker explained that "individuals who are on meth, are prone to significant anxiety," memory issues, and "a syndrome very similar to paranoid

[101] ECF No. 15-43 at 4–5.

[102] *Strickland*, 466 U.S. at 690.

[103] *Harrington*, 562 U.S. at 109 (explaining that "[c]ounsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies").

[104] ECF No. 13-33 at 59.

[105] *Id.* at 105, 109.

19

schizophrenia."[106]  Finally, Taylor's trial counsel argued during closing arguments that Ashley

was affected by methamphetamine and that "[t]he alleged kidnapping [was] in Ashley's

mind."[107]  Because the Nevada Court of Appeals reasonably denied Taylor's *Strickland* claim,

Taylor is denied federal habeas relief for Ground 4.

### 5.    *Ground 5—failure to request instruction about drug-addict testimony*

In Ground 5, Taylor asserts that his federal constitutional rights were violated when his

trial counsel failed to request a cautionary instruction concerning testimony from a

methamphetamine addict.[108]  In Taylor's appeal of the denial of his state habeas appeal, the

Nevada Court of Appeals rejected this theory:

> Lavelle-Taylor argued [that] his counsel was ineffective for failing
> to request an instruction regarding the unreliability of the victim's
> testimony given her status as a drug addict.  Lavelle-Taylor failed
> to demonstrate his counsel's performance was deficient or
> resulting prejudice.  The trial court instructed the jury regarding
> the determination of the credibility of witnesses and Lavelle-
> Taylor failed to demonstrate objectively reasonable counsel would
> have sought an additional instruction regarding a similar issue.
> Given the evidence produced at trial and the circumstances of this
> case, Lavelle-Taylor failed to demonstrate a reasonable probability
> of a different outcome at trial had counsel sought this type of
> instruction.  Therefore, the district court did not err in denying this
> claim without conducting an evidentiary hearing.[109]

The Nevada Court of Appeals rejection of Taylor's *Strickland* claim was neither contrary

to nor an unreasonable application of clearly established law as determined by the United States

Supreme Court.  As explained in Ground 4 above, Taylor's defense theory at trial centered

around Ashley's lack of credibility due to her methamphetamine addition.  However, because

---

[106] *Id.* at 112–13.

[107] ECF No. 13-35 at 102–04.

[108] ECF No. 5 at 11.

[109] ECF No. 15-43 at 6–7.

1   Nevada law provides that a state district court does not have to accept duplicative jury

2   instructions,[110] the Nevada Court of Appeals reasonably determined that Taylor's trial counsel

3   was not deficient for failing to request an instruction on his defense theory regarding Ashley's

4   reliability.  Indeed, the jury was already instructed on witness credibility generally,[111] making

5   another, more specific instruction on credibility unnecessary.

6          Even if Taylor's trial counsel was deficient, the Nevada Court of Appeals reasonably

7   concluded that Taylor failed to demonstrate prejudice.[112]  Two employees of the Ponderosa

8   Hotel, Chittem and Daniels, confirmed Ashley's version of events.  And Jessica Johnson testified

9   that when Smith-White and Taylor came to her room at the Castaway Motel on August 20, 2012,

10  with Ashley, Smith-White indicated to Johnson that Ashley was "kidnapped.  She has to come

11  in."[113]  Based on this corroborating evidence, Taylor fails to demonstrate that, but for his trial

12  counsel's potential failure to seek an additional jury instruction on witness credibility as it

13  pertains to drug usage, the result of the proceeding would have been different.[114]  Taylor is

14  denied federal habeas relief for Ground 5.

15

16

17

18  [110] *Carter v. State*, 121 P.3d 592, 596 (Nev. 2005).

19  [111] *See* ECF No. 14 at 21 (Jury Instruction No. 19 providing that "[t]o the jury alone belongs the
    duty of weighing the evidence and determining the credibility of the witnesses.  The degree of
20  credit due a witness should be determined by his or her character, conduct, manner upon the
    stand, fears, bias, impartiality, reasonableness or unreasonableness of the statements he or she
21  makes, and the strength or weakness of his or her recollections, viewed in the light of all the
    other facts and evidence.  If the jury believes that any witness sworn falsely, they may disregard
22  the whole or part of the evidence presented by the witness.").

    [112] *Strickland*, 466 U.S. at 694.

23  [113] ECF No. 13-34 at 47, 50, 59.

    [114] *Strickland*, 466 U.S. at 694.

**C.      Certificate of Appealability**

The right to appeal from the district court's denial of a federal habeas petition requires a certificate of appealability.  To obtain that certificate, a petitioner must make a "substantial showing of the denial of a constitutional right."[115]  "Where a district court has rejected the constitutional claims on the merits," that showing "is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[116]  Because I have rejected Taylor's constitutional claims on their merits, and he has not shown that this assessment of his claims is debatable or wrong, I find that a certificate of appealability is unwarranted in this case.

**Conclusion**

IT IS THEREFORE ORDERED that the amended petition **[ECF No. 5] is DENIED,** and because reasonable jurists would not find my decision to deny this petition to be debatable or wrong, **a certificate of appealability is DENIED**.

The Clerk of Court is directed to ENTER JUDGMENT accordingly and CLOSE THIS CASE.

Dated: June 15, 2020

_____
U.S. District Judge Jennifer A. Dorsey

---

[115] 28 U.S.C. § 2253(c).

[116] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).